Of Counsel:
BUSHNELL LAW GROUP

BLAKE W. BUSHNELL    #4492-0
STUART T. FEELEY        #4218-0
1099 Alakea Street, Suite 2500
Honolulu, Hawaii 96813
Telephone: (808) 585-6050
bbushnell@bushnelllawgroup.com
sfeeley@bushnelllawgroup.com

Attorneys for Plaintiffs
IMPACT ENVIRONMENTS, INC.
and JOHN DEVON DEPAULIS

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES for the use and benefit of IMPACT ENVIRONMENTS, INC., a Hawaii corporation, and JOHN DEVON DEPAULIS, a Hawaii resident,<br><br>Plaintiffs,<br><br>vs.<br><br>DAVID BOLAND, INC., and WESTERN SURETY COMPANY,<br><br>Defendants. | Case No.<br><br>COMPLAINT; EXHIBITS "A" - "C" |

## COMPLAINT

Plaintiff UNITED STATES for the use and benefit of IMPACT ENVIRONMENTS, INC., and JOHN DEVON DEPAULIS, by and through their attorneys, Bushnell Law Group, brings their Complaint against Defendants DAVID BOLAND, INC. and WESTERN SURETYCOMPANY, as follows:

## NATURE OF LAWSUIT

1.      Impact Environments, Inc. ("Impact" or "IEI") brings this lawsuit for non-payment for labor, materials and/ or equipment Impact furnished for a federal government construction project at Wheeler Army Airfield, Oahu, Hawaii.  Impact and DePaulis assert their rights to payment under the Miller Act, 40 U.S.C. § 3133 et seq.

## PARTIES, JURISDICTION AND VENUE

2.      Impact is a corporation duly organized and existing under the laws of the State of Hawaii, with its principal place of business in Honolulu, Hawaii.

3.      John Devon DePaulis ("DePaulis") is a Hawaii resident.  Mr. DePaulis is the owner and president of Impact.

4.      Defendant David Boland, Inc. ("Boland" or "DBI") is a corporation duly organized and existing under the laws of the State of Florida, with its principal place of business in Titusville, Florida.

5. Defendant Western Surety Company ("Western") is a corporation duly authorized to engage in the business of executing surety bonds in the State of South Dakota, with its principal place of business in South Dakota.

6. This action relates to and arises out of a contract between the parties pertaining to work performed and materials furnished by each party to a construction project at Wheeler Army Airfield, Oahu, Hawaii; the Court has personal jurisdiction over each defendant.

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C § 1331 and the mandate of the Miller Act, 40 U.S.C. § 3133(b)(3)(B), as well as pendant jurisdiction and supplemental jurisdiction over the state law claims alleged in the Complaint pursuant to 28 U.S.C. § 1367.

8. Venue therefore lies in the United States District Court for the District of Hawaii pursuant to 40 U.S.C. § 3133(b)(3)(B) and 28 U.S.C § 1391(b)(2).

## FACTUAL BACKGROUND

9. On or about June 29, 2012, Boland was awarded a contract with the United States Army Corps of Engineers ("USACE") for the construction of infrastructure for a Combat Aviation Brigade ("CAB") at the Wheeler Army Airfield located in Oahu, Hawaii (the "Project"). The contract ("Prime Contract") was identified as Contract Number W9128A-12-C-009.

10.    In connection with the Prime Contract and the work thereunder, Boland obtained and furnished a Federal Miller Act payment bond (hereinafter the "Bond") from Western (Bond No. 929549483) in the penal sum of $54,772,000, pursuant to which Western, as surety, bound itself to pay, jointly and severally with Boland, any and all unpaid amounts owed to Impact/DePaulis or other subcontractors and suppliers on the Project.  A copy of the Bond is attached as **Exhibit "A"**.

11.    The Miller Act requires that any action or suit on the Bond be brought in the United States District Court for any district in which the work on the project was performed and executed.

12.    On or about January 4, 2013, Boland and Impact entered into a subcontract ("Subcontract") whereby Impact agreed to perform certain labor, materials, equipment, and services for the construction of the Project.  A copy of the Subcontract is attached as **Exhibit "B"**.

**The Subcontract**

13.    Boland formed a Subcontract with Impact/DePaulis pursuant to which Impact would re-vegetate 160 acres of area located at the Project.  Impact/DePaulis were required under the Subcontract to apply, by hydro-seeding machine, 2,000 Lbs/Acre Hydraulic Mulch, 67% Hulled Bermuda seed, 33% Annual Rye seed, install Temporary above-ground Irrigation System, and maintain Hydro-Seeded

area until 95% ground coverage of either/both grass species for a minimum of 90

days or until minimum (95%) coverage is achieved, whichever is later.

14.   Upon meeting maintenance requirements, Impact was free to remove

its temporary irrigation material and had no further obligation to maintain the

seeded areas.  However, Impact/DePaulis were (pursuant to the Subcontract)

available to provide mowing services at an hourly rate set forth in the Subcontract.

15.   The Subcontract, attached hereto as Exhibit "B", provides, among

other things, the scope of Impact's work as follows:

> The Subcontractor shall furnish all labor, materials, and equipment
> necessary to provide all required:
>
> 1.   Permanent grassing within the limits of grading as specified by
>      Subparts 2.3.10 through 2.3.12, 2.5.13 through 2.5.13.3, 3.3.4,
>      3.3.11, 3.3.12.2 through 3.3.12.2c and 3.5, and to the extent
>      applicable, Part 1 and Subparts 2.10, 3.1, 3.3.5, 3.3.11, 3.3.12,
>      and 3.6 through 3.7 of Section Number 31 32 11 of the
>      specifications.
>
> 2.   Temporary irrigation and maintenance (including mowing) of
>      all newly planted grass within the limits of grading as specified
>      by Subparts 3.3.12.2c, 3.5 through 3.6.1, and to the extent
>      applicable, Part 1 of Section Number 31 32 11 of the
>      specifications.
>
> Restoration of grassing damaged or disturbed by others during the
> performance of the underground site utilities work will be performed
> by others.

See Subcontract, Exhibit "B" at its Exhibit "A".

16.     The Subcontract further provides an estimate of total area Impact was

required to Hydro-seed, as well as the contract unit price using a per square-foot

unit of measure.

> The subcontract amount is based upon the Subcontractor being
> required to provide, temporarily irrigate, and maintain an
> estimated quantity of 6,969,600 square feet (160 acres) of
> seeding within the limits of grading. Should the actual "in
> place" quantity of the seeding vary from the estimated quantity,
> a subcontract agreement change order will be issued to adjust
> the subcontract amount for the variation in quantity. The
> amount of the change order shall be based upon the difference
> between the actual "in place" quantity (in square feet) and the
> estimated quantity times $0.11. This is not for the purpose of
> defining the scope of the Subcontractor's Work, which is
> described in Exhibit A of the Subcontract Agreement.

See Exhibit D to the Subcontract (attached as Exhibit "B").

17.     The Subcontract allows Boland to obtain additional work from Impact

but requires that if such work increases Impact's cost or requires more of

[Impact's] time, the Subcontract must be adjusted *equitably*.  It says:

> The Contractor (DBI) shall furnish the Subcontractor with
> written notice of any such change, addition, or reduction in the
> work.
>
> If any such change causes an increase or decrease in [Impact's]
> cost of or time required for the performance of this Subcontract
> Agreement, an equitable adjustment shall be made and this
> Subcontract Agreement modified in writing accordingly.

See Exhibit "B" at Para. 10.

18.     Payment to Impact is required as follows:

[Impact] shall submit payment requests to [DBI], on the forms and utilizing the procedures required by [DBI], no later than the 30th day of the month for each preceding thirty (30) day period showing the value of the Work completed to that date and the materials delivered to the construction site, as estimated and approved by the Architect, and on the Architect's certification if provided for in the Prime Contract, or on authorization of the Owner, from which shall be deducted: (1) a retainage of ten percent (10%); (2) All previous payments; and (3) All charges or services, materials, equipment, and other items furnished by [DBI] to or chargeable to [IEI]. Upon the condition precedent that payment has been received by [DBI] from the Owner the balance of the amount of such request as approved by [DBI], the Architect, or the Owner's representative shall be due and payable to [IEI] out of the Owner's actual payments to [DBI] seven (7) days after [DBI's] receipt of actual payment from the Owner.

See para. B of Subcontract (Exhibit "B").

**Impact's Work**

19.     On January 16, 2013, Impact/DePaulis began its work under the Subcontract by seeding and temporarily irrigating several areas at the Project and provided mowing services on an hourly rate per the contract.  Contract required area of 6,969,600 square feet of seeding was completed on July 6, 2018.

20.     Impact/DePaulis have submitted the following pay applications, and has received the payments set forth in the table below:

| Date | Description | Amount | Retention - 10% | Amount Due Less Retention | Payment Received |
|------|-------------|--------|-----------------|---------------------------|------------------|
| 7/31/13 | Pay App. #1 | 24,272.12 | 2,427.21 | 21,844.91 | |
| 8/31/13 | Pay App. #2 | 22,888.80 | 2,288.88 | 20,599.92 | |

| | | | | | |
|---|---|---|---|---|---|
| 9/23/13 | Payment | | | | (21,844.91) |
| 9/30/13 | Pay App. #3 | 4,862.00 | 486.20 | 4,375.80 | |
| 10/31/13 | Payment | | | | (20,599.92) |
| 10/31/13 | Pay App. #4 | 23,910.23 | 2,391.02 | 21,519.21 | |
| 1/23/14 | Payment | | | | (4,375.80) |
| 5/23/14 | Payment | | | | (10,908.00) |
| 10/31/14 | Pay App. #5 | 156,860.83 | 15,686.08 | 141,174.75 | |
| 3/11/15 | Payment | | | | (160,083.95) |
| 3/31/15 | Pay App. #6 | 119,659.12 | 11,965.91 | 107,693.21 | |
| 5/29/15 | Payment | | | | (86,352.41) |
| 5/31/15 | Pay App. #7 | 50,766.90 | 5,076.69 | 45,690.21 | |
| 6/30/15 | Pay App. #8 | 57,498.90 | 5,749.89 | 51,749.01 | |
| 7/31/15 | Pay App. #9 | 50,766.90 | 5,076.69 | 45,690.21 | |
| 8/20/15 | Payment | | | | (51,749.01) |
| 8/27/15 | Payment | | | | (58,733.01) |
| 10/16/15 | Payment | | | | (45,690.21) |
| 12/23/15 | Payment | | | | (1,110.78) |
| 12/31/15 | Pay App. #10 | 74,460.14 | 7,446.01 | 67,014.13 | |
| 3/17/16 | Payment | | | | (7,816.50) |
| 3/22/16 | Payment | | | | (63,501.70) |
| 4/30/16 | Pay App. #11 | 65,263.50 | 6,526.35 | 58,737.15 | |
| 5/31/16 | Pay App. #12 | 13,758.50 | 1,375.85 | 12,382.65 | |
| 8/31/16 | Pay App. #13 | 13,605.00 | 1,360.60 | 12,244.50 | |
| 3/31/18 | Pay App. #14 | 37,062.08 | 3,706.21 | 33,355.87 | |
| 4/30/18 | Pay App. #15 | 49,756.19 | 4,975.62 | 44,780.57 | |
| 5/31/18 | Pay App. #16 | 93,162.30 | 9,316.23 | 83,846.07 | |
| 6/30/18 | Pay App. #17 | 96,446.90 | 9,644.69 | 86,802.21 | |
| 7/19/18 | Payment | | | | (16,739.46) |
| 7/31/18 | Pay App. #18 | 53,678.24 | 5,367.82 | 48,310.42 | |
| 8/09/18 | Payment | | | | (25,256.36) |
| 8/31/18 | Pay App. #19 | 7,821.77 | 782.18 | 7,039.59 | |
| | TOTAL | 901,254.94 | | | (574,762.02) |

21.     The total payments made to Impact ($574,762.02) fall far short of the

amount requested and submitted for completed work under the payment

applications made to Boland.

22.     Thus, Boland owes at least $326,492.92 to Impact in unpaid work, $54,473.25 in finance charges that were incurred due to DBI's failure to pay in accordance with the Subcontract, and $100,986.61 for replacement of Impact's irrigation material destroyed onsite by Boland.

23.     Boland and its surety still owe Impact at least **$481,952.78** in connection with the Subcontract and the approved Change Order Nos. 1 -19.

24.     Additionally, due to the refusal of Boland to timely perform its contractual obligations due under the Subcontract, Impact lost a valuable contract with a third party that resulted in substantial lost profits of at least $320,691.00.

25.     During construction Boland knowingly, willfully and repeatedly impeded Impact's progress in a negative fashion by interfering with, obstructing, and failing to honor its contractual duties, including, but not limited to, disrupting access to construction areas, adding restrictions to the work that negatively impacted progress, failing to coordinate the work of the various trades, failure to timely or diligently address issues raised by Impact/DePaulis and the USACE, failure to complete other activities on site that disrupted and negatively impacted Impact /DePaulis in the performance of its work, constant indecision, failing to manage and facilitate a productive relationship with USACE and resolve issues as they arose, failing to have areas ready for Impact to perform its work, constant direction to perform work in a piecemeal fashion and in different areas of the site,

failing to develop a coherent schedule,  failing to work with Impact/DePaulis to

timely achieve resolution of issues of continuity by Boland project personnel, and a

general lack of communication and slow and incomplete transmittal of information

gained in meetings with USACE.

### Examples of Boland's Failure to Comply with Subcontract

26.     Boland failed to issue payments, as required under Para. B. of the

Subcontract (Exhibit B).  To wit, Impact's investigation with the U.S. Army Corps

of Engineers (USACE) found that Boland, since project start, did not submit

Impact's monthly pay application amounts to the USACE as required by contract.

Instead Boland submitted pay requests to the USACE that did *not match* the Unit

Price format set forth in the Subcontract. By submitting incorrect pay requests,

Boland knowingly and willfully breached the Subcontract.

27.   Boland *admitted* that the pay requests were did not accord with the

Subcontract, and repeatedly promised to correct this such breaches, but never did

so.

28.   In addition, Boland did not measure Impact's Square Foot quantity

completed each month as required to comply with Exhibit D of the Subcontract.

Without measurements there is no way for Boland to properly request payment

pursuant to the contract because the Subcontract requires that Impact be paid per

square foot of re-vegetation, for a total of 6,969,600 square feet of seeding.

29.     Moreover, Boland breached the Subcontract by failing to pay for work performed under the contract requirement of 6,969,600 square feet along with seeded area completed above and beyond the contract required square footage totaling 171,854 square feet resulting in 7,141,454 square feet of "in place" seeding to date.

30.     Per Exhibit D of the Subcontract, Boland is required to issue a change order for "in place" seeding in excess of the "estimated" seeding requirement, no change order was issued.

31.     In May 2018, it became apparent to Impact/DePaulis that the total area requiring seeding exceeded the quantity covered by the Subcontract.  Impact informed DBI's site superintendent Chuck Hall of this, but Boland provided no written notice of intent to increase Impact's seeding quantity as required by the Subcontract.

32.     On July 3, 2018, Impact informed Boland that it had nearly completed seeding the required square footage set forth in the Subcontract, and that Impact would cease seeding operations when Impact's contract requirement was met.

33.     Boland attempted to deal with the quantity of work not covered by Impact's contract by issuing unilateral change orders, adding additional work at the rate of $.11 per square foot as stated at Exhibit D of the Subcontract (Exhibit "B").

34.     On August 14, 2018, Craig Hilldebrandt, Boland's Vice President of

Operations, sent an email to Impact, which misconstrued the parties' obligations

regarding additional work required at the project:

> Our previously outlined position remains that the subcontract
> agreement contemplates, and [IEI] is obligated to perform, the
> total grassing quantity required to complete the entire scope of
> work with adjustments to the estimated quantity in the
> subcontract.  The issuance of the two unilateral change orders
> increasing the estimated quantity for the grassing is consistent
> with this.

35.     Impact neither agreed to, nor signed the "unilateral change orders",

and contends that the $.11/square foot rate set forth in the Subcontract was based

on Impact's prevailing rate at the time it bid the subcontract.  However, the 2012-

13 rates ($.11/square foot) were outdated, and no longer applicable nor practicable,

as six years had passed.

36.     Paying $.11 per square foot for additional work was not equitable and

the "unilateral change orders" issued by Boland do not conform with paragraph

10A's required process for changing/increasing work requirements.

37.     On July 19, 2018, Craig Hildebrandt wrote an email with Boland's

position which violates contract requirements for Changes/Claims under contract

paragraph 10A.

> The rate stipulated by the contract will remain, if you wish to
> pursue increased costs due to delays that were government
> caused you may do so and it will be presented to the USACE
> for review.  However, the most significant Government delay

which was the untimely occupancy of the fueling system I provided Impact an opportunity to provide a proposal, which you indicated you would, but ultimately, despite follow-up requests one was never received and Boland proceeded with submission omitting any costs from Impact.  See attached prior emails for which Impact did not respond.  The REA for the delayed occupancy is currently under review by the USACE and if denied Boland will be pursuing through the U.S. Court of federal claims, this may provide an opportunity for us to amend our proposal to include costs by Impact. Note, the 6 years you state below, is not accurate and does not consider that your bid price should not have been for the cost of seed at bid but rather the expected cost of seed during the period of performance.

Para. 3 of the Subcontract says, in relevant part:

> PAYMENT AND RETAINAGE
> 3.A.  The Contractor shall pay the Subcontractor and the Subcontractor agrees to receive and accept Seven Hundred Sixty-Six Thousand Six Hundred Fifty-Six 00/100 ------------ DOLLARS ($766,656.00) as full compensation for performance and completion of the Work described herein.  The payment includes all federal, state, county, municipal, and other taxes imposed by law and based upon labor, services, materials, equipment, or other items acquired, performed, furnished, or used for or in connection with the Work, including, but not limited to, sales, use, and personal property taxes payable by or levied or assessed against the Owner, Contractor, or Subcontractor. Where the law requires any such taxes to be stated and charged separately, the total price of all items included in the Work plus the amount of such taxes shall not exceed the price specified in this paragraph.  It is understood and agreed that the price specified in this paragraph is a firm price and is not subject to change except as provided in this Subcontract Agreement."

Importantly, the above-quoted paragraph, specifically indicates that the contract

price is subject to change "as provided in this Subcontract Agreement."

38.     Boland's reliance on the contract price as a "firm price" ignores the contract provision cited above which requires an **equitable adjustment** where a change in the scope of work results in Impact's cost or time on the project. Impact's original pricing was $.11 per Square Foot, the proposal sent to Boland in August 2018 from Impact contained an adjustment in price from $.11 to $.125 per Square Foot.

39.     These issues and problems were the subject of constant discussions and written correspondence between Impact and Boland, and they led to many discussions in hopes of finding prompt resolutions of the issues and facilitating improved performance by Boland going forward.

40.     Despite the conversations, letters, emails, meetings, and site inspections, Boland refused to timely resolve the disputed payment issues and tried to manipulate Impact/DePaulis by unilaterally imposing duties and further work upon Impact without complying with the Subcontract terms and conditions.

41.     In addition to the items, issues and problems set forth in the paragraphs above, other issues and claims exist between Boland and Impact pertaining to the Project that must be resolved.

42.     Impact/DePaulis were not alone in their complaints about Boland's conduct, scheduling, management and performance with respect to the Wheeler project.  Other subcontractors and the USACE documented their complaints,

objections, disputes and conflicts with Boland.  In fact, Boland acknowledged that

its scheduling was "below average", its management was "below average" and its

overall performance was "below average" on the Project.  Boland conceded that a

"strained relationship developed with the USACE on this Project.

43.    Impact/DePaulis continued to perform services on the job site in

September and October 2018.  On or about October 25, 2018, Impact/DePaulis

provided further services in connection with the maintenance of the irrigation

pipes, values and above-ground system.

44.    Upon information and belief, Boland had not completed its

obligations to USACE as the prime contractor at the Project as of early 2019.

**The Parties Have Already Engaged in Mediation**

45.    Pursuant to the relevant provision of the Subcontract, para. 13A,

Impact and Borland agreed to engage in mediation in an effort to resolve this

dispute.  Said mediation took place in Orlando, Florida on or about April 2, 2019.

46.    The mediation failed to resolve the case.  The attorney-mediator

provided a report to the parties declaring that the mediation resulted in an

"impasse" and that the mediation was "concluded."  A copy of George Spofford

IV's Post-Mediation Report dated April 3, 2019 is attached as **Exhibit "C".**

## COUNT I – MILLER ACT PAYMENT BOND (AGAINST WESTERN)

47.   Impact and DePaulis restate and incorporate the preceding paragraphs. Unless otherwise stated herein, the legal claims asserted by Impact and DePaulis are intended to be joint and mutual claims.

48.   The United States of America bring this claim for the use and benefits of Impact in accordance with 40 U.S.C § 3133 et seq.

49.   Impact and DePaulis are in direct contractual relationship with Boland.

50.   Impact and DePaulis furnished labor, materials and equipment in connection with the prosecution of the work on the Project for which they have not been paid in full.

51.   Impact and DePaulis have satisfied all conditions precedent to payment under the Bond and to payment for the labor.

52.   Western is obligated, pursuant to the Bond, to pay Impact for the labor, materials and services Impact furnished and for which it was not been paid.

53.   Impact is entitled to payment from Western pursuant to, *inter alia*, the Miller Act, 40 U.S.C. § 3133.

54.   Pursuant to the Prompt Payment Act, 40 U.S.C. § 3133 et seq. and the Subcontract, Boland is obligated to pay an interest penalty to Impact on all funds improperly withheld from Impact.

55.    As a direct and proximate result of multiple and material breaches of the Subcontract, Impact and DePaulis have suffered substantial damages in an amount to be proven at trial.

### COUNT II – BREACH OF CONTRACT (AGAINST BOLAND)

56.    Impact and DePaulis restate and incorporate by reference the preceding paragraphs.

57.    The Subcontract is a valid and enforceable contract.

58.    Impact and DePaulis fully performed their obligations under the Subcontract.

59.    Boland materially breached the Subcontract in a number of ways, including but not limited to failing and refusing to pay the amount Impact when due, failing to pay for the labor and materials due under the signed Change Orders; actively, knowingly and willfully interfering with Impact's progress on the Project; and any damages that results from Boland's withholding, denying or refusing to submit timely and accurate payment submittals.

60.    Boland's failure to fulfill its obligations under the Subcontract constitutes a material breach of the Subcontract.

61.    As a direct and proximate result of Boland's breaches of the Subcontract, Impact and DePaulis have incurred and will continue to substantial damages.

## COUNT III –QUANTUM MERUIT (AGAINST BOLAND)

62.     Impact and DePaulis restate and incorporate by reference that preceding paragraphs.

63.     At Boland's request and direction, Impact and DePaulis provided certain labor, materials and supplies for the completion of the hydroseeding and grassing Project.  Said materials included Impact's own above-ground irrigation equipment that was to be removed at the end of the Project.

64.     It would be unjust and/or inequitable for Boland to retain the benefit of Impact and DePaulis' work on the Project and/or its materials, supplies and equipment without fully compensating Impact and DePaulis for such work and materials.

65.     On the grounds of equity, and in consideration for the unjust enrichment of Boland, Impact and DePaulis is entitled to recover those monetary damages in an amount to be established at trial.

## PRAYER FOR RELIEF

WHEREFORE, Impact/DePaulis pray for judgement in its favor against Defendant as follows:

A.     Damages in an amount to be proven at trial;

B.     For pre-judgement and post judgement interest to the extent allowed by contract or law;

C.      For attorneys' fees and cost to the extent allowed by contract or law;

and

D.      For such other relief as the Court deems just and equitable.

Dated: Honolulu, Hawaii, September 18, 2019.


                                        /s/ Stuart T. Feeley
                                        Blake W. Bushnell
                                        Stuart T. Feeley

                                        Attorneys for Plaintiffs
                                        IMPACT ENVIRONMENTS, INC.
                                        and JOHN DEVON DEPAULIS